**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #:_____    │
│ DATE FILED: 4/21/2022        │
└─────────────────────────────┘
```

PETER V. CORRIGAN,

                    Plaintiff,

          - against -

NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS AND JOINERS OF AMERICA,

                    Defendant.

**20 Civ. 1336 (VM)**

<u>**DECISION AND ORDER**</u>

**VICTOR MARRERO, United States District Judge.**

Plaintiff Peter Corrigan ("Corrigan") brings this action against the defendant New York City District Council of Carpenters and Joiners of America ("District Council") alleging violations of Section 101(a)(2) ("Section 101(a)(2)"), 102 ("Section 102"), and 609 ("Section 609") of the Labor Management Reporting and Disclosure Act ("LMRDA"). (<u>See</u> "Amended Complaint" or "AC," Dkt. No. 21.) On August 26, 2021, the District Council filed a pre-motion letter expressing its intent to move for dismissal of the Amended Complaint, which the which the Court now construes as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").[1] (<u>See</u> "Motion" or "Mot." Dkt. No. 23.) On August 27, 2021, Corrigan filed his pre-motion letter

---

[1]    <u>See</u> <u>Kapitalforeningen Lægernes Invest v. United Techs. Corp.</u>, 779 F. App'x 69, 70 (2d Cir. 2019) (Mem.) (affirming the district court's ruling deeming the exchange of letters as the motion itself).

opposing the Motion. (See "Opposition" or "Opp'n," Dkt. No. 16.) For the reasons stated below, the Motion is **GRANTED**.

## I.   BACKGROUND

A. <u>FACTS</u>[2]

The District Council is a regional body for the United Brotherhood of Carpenters and Joiners of America ("UBC"), which is one of North America's largest building trade unions. The District Council is an unincorporated association of nine individual labor unions. The current head of the District Council is Executive Secretary-Treasurer Joseph Geiger ("Geiger"). Geiger was a member of the Timbermen, Hod Hoist Carpenters, Core Driller and United Brotherhood Helpers Local 1536 ("Local 1536"), which was a constituent member within the District Council. Local 1536 eventually merged with another union to form Local 1556.

In 1994, the District Council and United States entered into to a consent decree ("Consent Decree"), which addressed alleged violations of the Racketeering Influenced and Corrupt Organizations Act. <u>See</u> Consent Decree, <u>United States v. District Council of N.Y.C. & Vicinity of the United Bhd. of</u>

---

[2]   Except as otherwise noted, the following background derives from the Complaint. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to the plaintiff, as required under the standard set forth in Federal Rule of Civil Procedure 12(b)(6) and explained in Section II, <u>infra</u>.

<u>Carpenters & Joiners of Am.</u>, No. 90 Civ. 5722 (S.D.N.Y. Mar. 4, 1994), Dkt. No. 410. The Consent Decree created an Investigations and Review Officer ("IRO"), with significant authority to supervise the District Council and ensure compliance with the Consent Decree. On November 18, 2014, the Court approved a stipulation between the United States and the District Council, which modified the Consent Decree by replacing the IRO with an Independent Monitor, who had more limited oversight authority. The Court appointed Glen G. McGorty as the Independent Monitor. Since that time, the Court has approved stipulations between the District Council and the United States to extend the Independent Monitor's supervision.

Corrigan is a journeyman carpenter, and a District Council member through the New York City (High Rise) Concrete Carpenters, Local 212 ("Local 212"). In January 2011, Corrigan was elected as a Local 212 delegate to the District Council's Delegate Body ("Delegate Body"). On March 21, 2016, Corrigan was hired as a business agent for Local 212. Corrigan alleges that he was the victim of retaliation, in violation of the LMRDA, for criticizing Geiger.

1. <u>Wage Reduction Proposal</u>

In 2017, the Delegate Body considered a proposal for modifying wages offered by employers that are part of the

General Contractors Association ("GCA"), which work on a building's foundation. At some point prior to 2017, the GCA employers and the District Council entered into the GCA Agreement ("GCAA"), which governed the wages GCA employers offered to union members. The GCA eventually complained to the District Council that the GCAA prevented GCA employers from offering lower wages on some jobsites, which made GCA employers less competitive compared to non-union contractors. In turn, GCA employers lost market share to non-union contractors.

In May 2017, Corrigan arranged a meeting with Geiger, another District Council officer, and GCA employers to discuss the market share losses endured by employers. The GCA employers asked for an exemption to the GCAA that would permit employers to decrease wages at certain jobsites so they could compete with non-union employers. Geiger agreed to the GCA's request, according to the Amended Complaint, but Geiger eventually revised this proposal to a blanket $15 per hour pay cut that GCA employers could apply to all journeymen ("GCAA Proposal").

Corrigan alleges that his opposition to the GCAA Proposal was "well known." (AC ¶¶ 75.) In particular, on June 9, 2017, Corrigan met with Geiger and a Local 212 executive, at which time Corrigan told him that he and members from

Locals 157 and 212 vehemently opposed the GCAA Proposal.
Geiger told Corrigan, "that's what it's going to be." (AC ¶
77.) Corrigan also alleges that another District Council
officer warned Corrigan to back off. (See AC ¶¶ 75-76.)
On June 14, 2017, a majority of the Delegate Body — 62 of 100
union delegates — approved the GCAA Proposal, while 38 union
delegates, including Corrigan, voted against the GCAA
Proposal.

    2. Corrigan's Termination as a Business Agent

    Allegedly in retaliation for opposing the GCAA Proposal,
Geiger had Corrigan investigated for violating the District
Council's job referral policies. The Amended Complaint
explains two practices for hiring union members at jobsites.
First, "job referring" is a practice where a carpenter at the
top of an out-of-work list is sent to a jobsite — which is
covered by a collective bargaining agreement — along with the
name for a hiring contact at the jobsite, and the employer
must hire the carpenter. Second, "job shaping" is when a
carpenter presents him or herself at a jobsite, without the
name of a hiring contact, and the employer has discretion
over whether to hire the carpenter.

    The Amended Complaint alleges that, pursuant to District
Council Bylaw 38 ("Bylaw 38"), "representatives, organizers
and agents" may not refer members to jobs or inform a

potential employer that a carpenter is available for hiring. (AC ¶ 45.) But the Amended Complaint notes that Bylaw 38 and the District Council's practices are imprecise about the distinctions between job referring and job shaping.

On July 17, 2017, Geiger forwarded an anonymous complaint to the District Council's Deputy Inspector General, Patrick Kennedy ("Kennedy"), that accused Corrigan of making prohibited job referrals. Kennedy and several investigators from the District Council's Office of the Inspector General ("OIG") thereafter investigated the complaint against Corrigan. The Amended Complaint explains that the OIG investigated several allegations that Corrigan referred apprentice carpenters to jobsites. Corrigan alleges he only engaged in "job shaping" by telling apprentice carpenters the locations of jobsites where they could find work, but he never engaged in "job referring" because he did not tell carpenters to see a specific person at any jobsite.

On January 15, 2018, the OIG issued its investigative findings, and concluded that Corrigan violated Bylaw 38 by job referring. The OIG did not propose any specific disciplinary action, but the OIG recommended that it meet with business representatives for the local unions in order to review the policy for referring union members. The OIG also recommended it continue enforcing the policy through

regular meetings with the local union representatives. But on May 7, 2018, Geiger suspended Corrigan as a business agent for Local 212, and Corrigan was terminated two days later.

An outside private investigative firm, Legal Research and Investigation, LLC ("LRI"), reviewed the OIG's investigation. When LRI finished its review, the Independent Monitor instructed its chief investigator, David Burroughs ("Burroughs"), to re-review the OIG investigation. Burroughs found inconsistencies in the OIG investigation, but he concluded, like the OIG, that Corrigan made improper job referrals. Burroughs found that Corrigan misunderstood the referral rules, and recommended that the District Council clarify the meaning of "referral" and what conduct clearly violates the job referral rule, along with enhanced training for current and future union business agents.

3. Suppression of Dissent in the District Council

Corrigan alleges that the District Council has a history of intimidating and terminating dissenting union members like himself. In support of this allegation, the Amended Complaint references Maddalone v. Local 17, United Brotherhood. of Carpenters & Joiners of America, 152 F.3d 178 (2d Cir. 1998), in which the Second Circuit found that the plaintiff adequately stated a Section 101(a)(2) claim based on allegations that the President of the District Council

ordered the firing of any members, including the plaintiff, who attended a union demonstration. Corrigan further alleges that the OIG terminated two of its investigators. Peter Marasalisi ("Marsalisi") was allegedly terminated "for looking into matters that threatened the interest of Geiger and his cronies." (AC ¶ 225.) Michael Donnelly ("Donnelly") was allegedly "forced out" for investigating a "Geiger crony." (AC ¶ 70.) Lastly, according to Corrigan, the Independent Monitor and the District Council's Inspector General labelled certain union violations as de minimis "to excuse corruption," while allegedly subjecting other carpenters who committed allegedly "far less egregious violations" to "substantial punishment." (Id.)

B. PROCEDURAL HISTORY

On February 24, 2020, Corrigan initiated this action against the District Council, the UBC, and Local 212. Consistent with the Court's Individual Practices, on March 18, 2020, the District Council wrote to Corrigan regarding an anticipated motion to dismiss under Rule 12(b)(6). (Dkt. No. 13.) Initially, Corrigan merely responded with an email that "invite[d] [the District Council] to make its motion." (Dkt. No. 17-2.) But on March 27, 2020, Corrigan filed a letter stating that he planned to "file an Amended Complaint, adding further facts to support his LMRDA claim against" the District

Council. (Dkt. No. 18.) Over five months later, Corrigan filed
the Amended Complaint solely against the District Council,
and he dismissed the UBC and Local 212 as defendants. (See
AC; Dkt. Nos. 20, 26.)

Further in line with the Court's Individual Practices,
on August 27, 2021, the District Council filed the Motion.
(See Mot.) Corrigan filed his Opposition on September 1, 2021.
(See Opp'n.) The Court will now resolve the Motion on the
basis of the letters and material in the record. See
Kapitalforeningen, 779 F. App'x at 70 (affirming the district
court's ruling deeming the exchange of letters as the motion
itself).

## II.   LEGAL STANDARD

To survive a motion to dismiss, pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570
(2007)). A complaint satisfies this standard when it contains
sufficient "factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." Id. A complaint should be dismissed if
the plaintiff has not offered factual allegations sufficient
to render the claims facially plausible. See id. However, if

the factual allegations sufficiently "raise a right to relief
above the speculative level," then a court should not dismiss
a complaint for failure to state a claim. <u>Twombly</u>, 550 U.S.
at 555.

In resolving a motion to dismiss, the Court's task is to
"assess the legal feasibility of the complaint, not . . . the
weight of the evidence which might be offered in support
thereof." <u>In re Columbia Pipeline, Inc.</u>, 405 F. Supp. 3d 494,
505 (S.D.N.Y. 2019) (quoting <u>Eternity Glob. Master Fund ltd.</u>
<u>v. Morgan Guar. Tr. Co. of N.Y.</u>, 375 F.3d 168, 176 (2d Cir.
2004)). In this context, the Court must draw reasonable
inferences in favor of the nonmoving party. <u>See id.</u> However,
the requirement that a court accept the factual allegations
in the complaint as true does not extend to legal conclusions.
<u>See Iqbal</u>, 556 U.S. at 678. In other words, a court must
"accept as true all factual allegations and draw from them
all reasonable inferences; but [it is] not required to credit
conclusory allegations or legal conclusions couched as
factual . . . allegations." <u>Dane v. UnitedHealthcare Ins.</u>,
974 F.3d 183, 188 (2d Cir. 2020).

### III.   DISCUSSION

A. <u>SECTION 101(a)(2)</u>

Corrigan argues that, in retaliation for his opposition
to the GCAA Proposal, and in violation of Section 101(a)(2)

of the LMRDA, the District Council investigated and
terminated Corrigan based on allegations that he made
prohibited job referrals. (See Opp'n at 1-2.) Section
101(a)(2) provides, in relevant part, that "[e]very member of
any labor organization shall have the right to meet and
assemble freely with other members; and to express any views,
arguments, or opinions; and to express at meetings of the
labor organization his views . . . ." 29 U.S.C. § 411(a)(2).[3]
Congress intended this provision to "protect union members
from oppressive union leadership while preserving the union's
right to adopt reasonable rules of governance." Sampson v.
Dist. Council of N.Y.C. & Vicinity of United Bhd. of
Carpenters & Joiners of Am., No. 10 Civ. 8120, 2012 WL
4471535, at *3 (S.D.N.Y. Sept. 27, 2012) (quoting Messina v.
Local 1199, SEIU, Nat'l Health & Human Serv. Emps. Union,
AFL–CIO, 205 F. Supp. 2d 111, 118 (S.D.N.Y. 2002)).[4]
In essence, Section 101(a)(2) safeguards union democracy by
ensuring members may exercise their right to freedom of speech
and assembly while free from retaliation for exercising that
right. See Maddalone, 152 F.3d at 183 ("Section 101(a)(2)

---

[3]  Pursuant to Section 102 of the LMRDA, there is a private right of
action for Section 101(a)(2) violations. See 29 U.S.C. § 412.

[4]  See also Kazolias v. IBEWLU 363, 806 F.3d 45, 51 (2d Cir. 2015) ("The
LMRDA was enacted 'to encourage democratic self-governance in unions'
as well as 'to correct widespread abuses of power and instances of
corruption by union officials.'" (quoting Franza v. Int'l Bhd. of
Teamsters, Local 671, 869 F.2d 41, 44 (2d Cir. 1989))).

protects union members from direct interference with union membership rights in retaliation for their expression of opinions concerning union activities.")

To state a Section 101(a)(2) claim, a plaintiff must establish the following: "(1) his conduct constituted free speech under the LMRDA; (2) that the speech was a cause for the Union taking action against him; and (3) damages." Ulrich v. Soft Drink, Brewery Workers & Delivery Emps., No. 17 Civ. 4730, 2019 WL 1228056, at *24 (S.D.N.Y. Mar. 15, 2019) (quoting Leavey v. Int'l Bhd. of Teamsters-Theatrical Teamsters Loc. Union No. 817, No. 13 Civ. 0705, 2015 WL 5802901, at *8 (S.D.N.Y. Oct. 5, 2015)). Section 101(a)(2) protects speech made in "the context of the union democratic process, i.e. political speech *primarily addressed to other union members*, rather than free speech at large." Leavey, 2015 WL 5802901, at *9 (quoting Helmer v. Briody, 759 F. Supp. 170, 176 (S.D.N.Y. 1991)). Complaints addressed only to union leaders or supervisors are not protected by the LMRDA. See Grant v. Commc'ns Workers of Am., Local 1101, No. 16 Civ. 9553, 2017 WL 6000605, at *5-6 (S.D.N.Y. Dec. 1, 2017) (finding complaint "fails to plead sufficient facts suggesting that [p]laintiff's complaints to union officials were ever communicated to other union members"); Leavey, 2015 WL 5802901, at *9 (dismissing LMRDA claim where plaintiff

"failed to present any evidence that his complaints, letters, and grievances, or the substance thereof, were communicated to other union members").

As a general rule, however, Section 101(a)(2) does not protect a union member's status as a union employee or appointed officer, such as a business agent. See Finnegan v. Leu, 456 U.S. 431, 438 (1982); Ulrich, 2019 WL 1228056, at *25. The Second Circuit recognized a rare exception to this rule "where the removal of a union officer was part of 'purposeful and deliberate attempt . . . to suppress dissent within the union.'" Maddalone, 152 F.3d at 184 (quoting Schonfeld v. Penza, 477 F.2d 899, 904 (2d Cir. 1973)). This rare exception requires a plaintiff to "present 'clear and convincing proof' that her dismissal was 'part of a series of oppressive acts by the union leadership that directly threaten the freedom of members to speak out.'" Id.

"The question is whether the action 'is merely an isolated act of retaliation for political disloyalty or is instead' a broad overall scheme to suppress dissent." Sampson, 2012 WL 4471535, at *4 (quoting Franza, 869 F.2d at 45). Courts have "allowed such claims to go forward where the removal of an officer or employee stemmed from longstanding and well-documented patterns of harassment and intimidation." Maddalone, 152 F.3d at 184. However, a union's actions against

an individual member are cognizable "only if that individual adequately pleads that he has become 'a symbol for a movement within the rank and file members,' so that 'discipline of that person could be considered threatening to the exercise of Title I rights by union members generally.'" Dilacio v. N.Y.C. Dist. Council of the United Bhd. of Carpenters & Joiners of Am., 593 F. Supp. 2d 571, 583 (S.D.N.Y. 2008) (quoting Franza, 869 F.2d at 45).

Corrigan argues that he was exercising his free speech rights under Section 101(a)(2) by opposing the GCAA Proposal, (see Opp'n at 1), but he fails to allege he engaged in speech protected by the LMRDA. The Amended Complaint alleges that Corrigan was a "stand up man who is not shy about voicing his opinions for the benefit of concrete carpenters," (AC ¶ 71), that Corrigan's opposition to the GCAA Proposal was "well known," (id. ¶ 75), and that "Geiger was furious that Corrigan would dare to publicly 'challenge' him over" the GCAA Proposal, (id. ¶ 115). But the Amended Complaint does not allege that Corrigan ever communicated his opposition to other union members. Instead, the Amended Complaint states that Corrigan spoke directly to Geiger and another Local 212 officer about his opposition to the GCAA Proposal, (see AC ¶ 77), and that he voted against the GCAA Proposal during a vote before the District Council's Delegate Body, (see AC ¶

78). But speaking to union leadership and merely voting against a proposal are insufficient to establish that Corrigan spoke to other union members. See Ulrich, 2019 WL 1228056, at *23-25 (finding that an allegation that "general union membership was aware" of complaints was insufficient to state an LMRDA claim because plaintiff did not allege he spoke to other union members); Grant, 2017 WL 6000605, at *6 (dismissing claim where plaintiff did not allege facts that complaints to union officers were relayed to other union members); Leavey, 2015 WL 5802901, at *9 (concluding that complaints solely addressed to union leadership were not protected under the LMRDA).

To adequately support an LMRDA claim, Corrigan must also allege that his termination as a union business agent — i.e., an appointed union officer — was part of a general scheme to suppress dissent. Corrigan relies, in part, on generalized allegations about Maddalone to establish a history of union leadership intimidating and firing union dissidents. (See AC ¶ 224.) The events in Maddalone occurred in January 1995, which is more than twenty years before Corrigan's termination. See 152 F.3d at 182. Corrigan fails to allege any facts that connect his termination, or Marsalisi's, to the general allegations about the decades-old conduct at issue in Maddalone. See Rodriguez v. Int'l Bhd. of Teamsters,

AFL-CIO, No. 98 Civ. 8849, 1999 WL 816182, at *3 (S.D.N.Y. Oct. 13, 1999) (finding plaintiff failed to invoke the exception to Section 101(a)(2) where allegations were regarding conduct predating the LMRDA and were "untied to anything particular regarding plaintiff").

In support of his claim, Corrigan also relies on several other contemporaneous events to establish a scheme of suppressing dissent. Marsalisi was allegedly terminated "for looking into matters that threatened the interests of Geiger and his cronies." (AC ¶ 225.) While Donnelly was allegedly "forced out because, among other things, he had investigated Geiger crony Brian McLaughlin for making non-OWL job referrals." (AC ¶ 95.) But the broad and vague allegations that Marsalisi was terminated for "looking into matters that threatened" Geiger and his affiliates, and that Donnelly was "forced out" for investigating a "Geiger crony" are unsupported by any facts stated in the Amended Complaint. Furthermore, Corrigan alleges that some carpenters who committed "far less egregious" union violations were subject to "substantial punishment." (AC ¶ 226.) But the Amended Complaint does not contain facts establishing that those union members were subject to punishment as a result of expressing dissenting views within the District Council. At bottom, these allegations do not bolster Corrigan's

allegation of the requisite long-standing history of the union leadership suppressing dissent within the District Council. See Maddalone, 152 F.3d at 185.

Furthermore, the assertion that Corrigan's termination was part of a scheme to suppress dissent is belied by Corrigan's own factual allegations that the Independent Monitor conducted its own investigation and concluded that Corrigan made job referrals. (AC ¶ 180.) And that the Independent Monitor approved Corrigan's termination. (AC ¶¶ 16, 125.) After taking the allegations in the Amended Complaint as a whole, Corrigan fails to sufficiently allege that his termination was part of a scheme to suppress dissent within the District Council. Sampson, 2012 WL 4471535, at *4.

The Amended Complaint also fails to sufficiently allege that Corrigan became a "symbol among the rank and file of union members." Dilacio, 593 F. Supp. 2d at 583 (quoting Franza, 869 F.3d at 45). Corrigan merely alleges that he was "known as a stand up man, who is not shy about voicing his opinions for the benefit of concrete carpenters," (AC ¶ 71), and that his opposition to the GCAA Proposal was "well known." (AC ¶ 75). But without more, this is insufficient to establish himself as a "symbol of a movement" so that disciplining him "could be considered threatening to the exercise of Title I rights by union members generally." Id. (quoting Franza, 869

F.2d at 45); Sampson, 2012 WL 4471535, at *4; Helmer, 759 F. Supp. at 175–176 (granting summary judgment where the plaintiff failed to present evidence establishing that he was the leader of any identifiable dissent faction among the membership).

For the above reasons, Corrigan's Section 101(a)(2) claim is dismissed.

B. SECTION 609

Corrigan also brings a claim under Section 609 of the LMRDA. Section 609 makes it "unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter." 29 U.S.C. § 529. In essence, Section 609 prohibits unions from retaliatory disciplining members for exercising the rights protected by Section 101. See id.

Similar to Section 101(a)(2), "as a general rule, discipline and removal 'from appointive union employment is not within the scope of those union sanctions expressly prohibited by [Section] 609." Sampson, 2012 WL 4471535, at *5 (quoting Finnegan, 456 U.S. at 439). But an exception exists for plaintiffs who can establish that they were disciplined

as "part of a series of oppressive acts by the union leadership that directly threaten the freedom of members to speak out." Id. (quoting Maddalone, 152 F.3d at 184).

For the reasons stated above, Corrigan cannot establish that he was disciplined for engaging in protected speech or that his termination as a Local 212 business agent was part of a deliberate retaliatory scheme to suppress dissent within the District Council. See Sampson, 2012 WL 4471535, at *5 (dismissing Section 609 claim where plaintiff failed to allege a Section 101(a)(2) claim). Therefore, Corrigan's Section 609 claim is also dismissed.

**ORDER**

For the reasons stated above, it is hereby

**ORDERED** that the motion from defendant New York District Council of Carpenters and Joiners of America to dismiss the Amended Complaint of plaintiff Peter Corrigan (Dkt. No. 23) is **GRANTED.** The Clerk of Court is directed to terminate all pending motions and close the case.

**SO ORDERED.**

Dated:      April 21, 2022
            New York, New York

_____
                        Victor Marrero
                        U.S.D.J.